IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND; and ARTHUR H. BUNTE, JR., as Trustee, <br><br> Plaintiffs, <br><br> v. <br><br> WINGRA REDI-MIX, INC., a Wisconsin corporation, <br><br> Defendant. | No. 12-cv-04084 <br><br> Judge Andrea R. Wood |

## MEMORANDUM OPINION AND ORDER

The Drivers, Salesmen, Warehousemen, Milk Processors, Cannery, Dairy Employees and Helpers Union Local No. 695 of the International Brotherhood of Teamsters ("Union") and Defendant Wingra Redi-Mix, Inc. ("Wingra") were parties to a collective bargaining agreement that obligated Wingra to make contributions to two of the Union's member benefit funds, Plaintiffs Central States, Southeast and Southwest Areas Pension Fund ("Pension Fund") and Central States, Southeast and Southwest Areas Health and Welfare Fund ("Health and Welfare Fund").[1] The Funds brought this lawsuit to recover alleged contribution underpayments. In response, Wingra contends that the amounts sought by the Funds are greater than the amounts required by the various agreements between it, the Union, and the Funds. Before the Court are the parties' cross-motions for summary judgment. (Dkt. Nos. 43, 45.) Because the Court finds no

---
[1] The Pension Fund and the Health and Welfare Fund, together with the trustee, Arthur Bunte, are "the Funds."

support for the lower contribution rates advocated by Wingra, its motion is denied and the Funds' motion is granted in part.

## BACKGROUND

Wingra and the Union were parties to a collective bargaining agreement ("CBA") that governed the terms and conditions of Wingra's employment of Union members. (Dkt. No. 46-9.) The CBA was to take effect on April 1, 2008 and remain in force until March 31, 2011, but it would be effective for an additional year in the absence of notice from either party of a desire to modify the agreement's terms. (*Id.* Art. 23.)

The CBA provided that beginning on its effective date, Wingra would contribute $237.70 per week to the Health and Welfare Fund for each qualified employee. (*Id.* Art. 19, Sec. 1.) It specified contribution rate increases that would take effect on April 1, 2009 and on the same date in 2010. (*Id.*) The CBA bound Wingra to the terms of the trust agreement that established the Health and Welfare Fund. (*Id.* Sec. 2.) The CBA further obligated Wingra to contribute $179.30 per qualified employee per week to the Pension Fund and provided for annual April 1 Pension Fund contribution rate increases in each year from 2009 through 2012. (*Id.* Art. 20, Sec. 1.)

Wingra and the Union were also parties to a "Participation Agreement," effective April 1, 2002. (Dkt. No. 46-12; Def.'s Rule 56 Resp. ¶ 16, Dkt. No. 61.) That agreement listed the rates at which Wingra was required to contribute to the Health and Welfare Fund and the Pension Fund for periods prior to the CBA's effective date—it established Health and Welfare Fund rates effective on April 1 for each year from 2003 through 2005 and Pension Fund rates effective on the same date for each year from 2002 through 2007. (Participation Agt. ¶¶ 2-3, Dkt. No. 46-12.) Paragraph 4 of the Participation Agreement provided that contribution rates for periods following

its listed dates "shall be determined by each new collective bargaining agreement and such rate changes shall be incorporated into this Agreement." (*Id.* ¶ 4.) The agreement further provided:

> The parties may execute an interim agreement establishing contribution rates during the periods when a new collective bargaining agreement is being negotiated. In the absence of an interim agreement, the contribution rate required to be paid after termination of a collective bargaining agreement and prior to either the execution of a new collective bargaining agreement or the termination of this Agreement, shall be the rate in effect on the last day of the terminated collective bargaining agreement.

(*Id.*)

In late 2011, Wingra and the Union executed an extension to the CBA. (Dkt. No. 46-11.) Sun Prairie Concrete, Inc., another employer whose workers had been covered by the CBA, was also a party to the extension. The term of the extension was "for one (1) year effective April 1, 2011 through March 31, 2012." (*Id.*) The parties agreed to meet for the purpose of negotiating a new CBA and also agreed to waive "the sixty (60) day opener as found under Article 23, Termination." (*Id.*) The extension included explicit provisions relating to contributions to the Pension Fund and the Health and Welfare Fund:

> The following contribution rates for pension and health and welfare benefits shall be paid on behalf of all covered employees retroactive to April 1, 2011.
>
> Pension: Effective April 1, 2011, $225.80 per week. Effective April 1, 2012, $243.90 per week.
>
> Health and Welfare: Effective April 1, 2011 through March 31, 2012.
>
> | | |
> |---|---|
> | Sun Prairie Concrete, Inc. | $255.70 per week |
> | Wingra Redi-Mix, Inc. | $281.70 per week |
>
> The R-4 retirement portion of Wingra's contribution shall be eliminated and the rate reduced to equal the Sun Prairie rate upon full execution of this Extension Agreement and a Letter of Understanding in which Wingra agrees to continue retiree health insurance for designated individuals as agreed to by the parties. The retiree coverage will be either the existing Central States Health and Welfare retiree coverage or retiree coverage available through the Wingra Stone Company

3

> Group Health Insurance Plan, as determined by the parties. Terms and conditions pertaining to participants' portion of the co-pay premium and termination of benefits upon reaching Medicare eligibility shall be provided in the Letter of Understanding.

(*Id.*) As of the filing of this action, Wingra and the Union had not reached agreement on a new CBA; nor had they executed a letter of understanding regarding retiree health coverage.

In a January 30, 2012 letter from its secretary-treasurer, Wayne Schultz, to Wingra president Robert Shea, the Union informed the company that it wished to amend terms of the CBA. (Dkt. No. 46-22.) A February 1, 2012 response letter from counsel for Wingra to Schultz stated that because of the extension agreement's waiver of the 60-day termination notice, the company understood the parties to agree that the extended CBA would terminate on March 31, 2012. (Dkt. No. 46-23.)

In April 2012, Wingra and the Funds exchanged communications regarding the company's undisputed obligation to pay outstanding contribution deficiencies from various months beginning sometime in 2006 and extending to November 2011. By letter of April 19, 2012, Leda Doherty, an accountant for the Funds, advised Wingra controller Douglas Block that the amount owed to the Health and Welfare Fund, including $2,400.68 in interest that would accrue as of April 20, was $17,820.18, and that the amount owed to the Pension Fund, including $1,630.11 in interest that would accrue as of April 27, was $23,740.47. (Dkt. No. 46-17.) Doherty's letter offered to waive half of the interest owed on each sum if Wingra paid the outstanding principal balance plus half of the interest to the Health and Welfare Fund by April 20 and to the Pension Fund by April 27. (*Id.*)

Doherty's letter also proposed that, beginning with billing for April 2012, Wingra contribute $289.70 per employee per week to the Health and Welfare Fund and $243.90 per employee per week to the Pension Fund. (*Id.*) Doherty suggested that the Health and Welfare

Fund contribution rates would apply until "the Letter of Understanding" was signed and that the two rates would continue "until future rates are required." (*Id.*)

Attached to Doherty's letter was an unsigned draft of a "Letter Of Understanding And Agreement," which began with the following statement: "It is the intent of the parties to eliminate the Retiree (R-4) coverage for all current and future employees covered by the collective bargaining agreement, except for those existing retirees specified in the chart displayed below." (Dkt. No. 46-28.) The proposed letter of understanding required Wingra to make contributions in specified amounts to the Health and Welfare Fund for four named employees until they became Medicare eligible, obligated the company to contribute to that fund at increased rates effective April 1, 2012 and March 31, 2013, and committed the company to payment of adjusted contribution rates in later periods as determined by the fund's trustees. (*Id.*)

Block responded to Doherty's letter in an e-mail message also dated April 19, 2012. (Dkt. No. 46-32.) Block's message reported that Wingra had mailed a check for $15,463.50 for the Health and Welfare Fund that day, and would be sending another check for $1,156.34 for that fund the next day. (*Id.*) Block's message did not address the proposed letter of understanding.

On May 1, 2012, Shea sent Union business representative Mark Herrmann a letter that stated: "Since [the Union] has not accepted the Company's outstanding offer on retiree health insurance coverage, the Company is implementing the lower non-retiree rate retroactively effective to April 1, 2012." (Dkt. No. 46-29.) For contributions after the April 1 date, Wingra paid the Health and Welfare Fund at the $255.70 rate that excluded the cost for retiree coverage. (Def.'s Resp. to Pls.' Stmt. of Material Facts ¶ 52, Dkt. No. 61.) The company also declined to pay the April 1 rate increase sought by the Pension Fund and continued to contribute at the lower $225.80 rate that was applicable through March 31. (*Id.* ¶ 61.)

On May 4, 2012, Doherty sent Block a message that acknowledged receipt of Wingra's payment to the Health and Welfare Fund. (Dkt. No. 46-18.) Her message stated that if payment of $22,925.46, which represented the past due principal balance plus half of the accrued interest, was not made to the Pension Fund by May 8, the funds' prior offer "will be null and void" and interest would be charged on the full remaining balance. (*Id*.) Block's return message on the same day reported that the pension check "is being held at a level above me in the company." (*Id.*) Then, on May 14, Block sent Doherty a message that advised that Wingra had mailed the pension check on May 11. The message added: "I do wish to clarify that I was not and am not authorized to agree with the other conditions in your April 19, 2012, letter regarding future monthly rates, billings, and payments, and stated such in our conversations." (*Id*.)

On the same day, Juan Beaton, the Funds' manager, collections division, sent an e-mail message to Block and Shea advising that Doherty's offer to waive half of the accrued interest on past due contributions had been conditioned upon payment by a deadline that had not been met for the Pension Fund and upon agreement to pay contribution rate increases that Shea's communications had apparently rejected. (*Id*.) Beaton stated that because of these departures from the terms of their offer, the Funds would not waive the interest charges discussed in Doherty's April 19 letter to Block. (*Id.*) On May 18, Beaton informed Block and Shea that Wingra's failure to pay the full interest previously owed and its failure to pay current contribution rates resulted in balances of $4,389.41 due to the Health and Welfare Fund and $3,070.66 to the Pension Fund. Beaton further advised that if payment was not received by May 23, the Funds would initiate litigation to collect amounts owed. (*Id.*)

The complaint commencing this action was filed on May 25, 2012. It alleged that Wingra had failed to pay contributions owed to the Funds and was based upon "employee work history

6

reported to the Funds by Wingra during the period of April 3, 2011 through April 28, 2012." (Compl., ¶ 22, Dkt. No. 1.) It asserted that Wingra owed $4,381.41 to the Health and Welfare fund and $3,068.04 to the Pension Fund. (*Id.* ¶¶ 24-25.) The complaint sought a judgment for "the unpaid contributions owed to the Funds based upon the employee work history reported by Defendant" plus interest, attorneys' fees, and costs. (*Id.* at 7-8.)

Wingra's contributions at rates lower than those billed produced consequences in addition to the present action: the Health and Welfare Fund notified the company in June 2012 that payment of claims under the plan would be suspended because of the contribution shortfall, and that suspension took effect the following month. (Beaton Aff. ¶ 25, Dkt. No. 59-11.) Some Wingra employees paid the Health and Welfare Fund the difference between the company's contribution and the amount billed in order to maintain coverage. (*Id.* ¶ 26.) Wingra continued to make contributions to the Funds through May 2013, although the amounts it paid were less than the amounts the Funds considered due. (Dkt. No. 48-20.)

The Funds and Wingra seek summary judgment on the Funds' claims. Wingra contends that its payment and the Funds' acceptance of the amounts it sent in April and May 2012 constituted an accord and satisfaction as to the outstanding sums that were the subject of the communications between Doherty and Block. The company also claims that its contractual arrangements with the Union and the Funds did not require it to pay the April 1, 2012 pension contribution rate increase, and that those arrangements also entitled it to reduce its Health and Welfare Fund contributions to a level that excluded payments for retiree benefits. The Funds seek summary judgment for amounts they calculate as owed as of June 13, 2012, plus interest, attorneys' fees, and costs. (Pls.' Mot. for Summ. J. at 3-4, Dkt. No. 45.)

**DISCUSSION**

Summary judgment is proper where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). Disputed issues of law are properly resolved on a motion for summary judgment. *Forman v. Richmond Police Dept.,* 104 F.3d 950, 957 (7th Cir. 1997).

I. **2006-2011 Interest Charges**

Wingra contends that it owes nothing to the Funds for interest charges for the period 2006 through 2011, which were the subject of the communications between Doherty and Block, because its payment and the Funds' acceptance of checks in April and May 2012 constituted an accord and satisfaction as to any such obligations.

It is true that, under certain circumstances, a claim may be resolved through accord and satisfaction. But a necessary element of such resolution is that the instrument offered in payment, or an accompanying written communication, include "a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim." *IFC Credit Corp. v. Bulk Petroleum Corp.,* 403 F.3d 869, 873 (7th Cir. 2005). A transaction will constitute an accord and satisfaction of a claim only where both parties intended it to have that effect; a single party cannot unilaterally create an accord and satisfaction. *Lowrance v. Hacker,* 866 F.2d 950, 954 (7th Cir. 1989).

In the present case, the Funds have presented evidence that the checks themselves contained no accord and satisfaction language and that they were received without any accompanying letter. (Dkt. No. 59-10; Aff. of Leda Doherty ¶¶ 14, 18, Dkt. No. 59-12.) Wingra does not contradict this evidence. Instead, the company bases its accord and satisfaction claim

upon its assertion that the Funds had agreed to waive half of the interest due, and then added unacceptable terms to the proposed agreement. (Def.'s Mem. in Support of Summ. J. at 2, 6, Dkt. No. 44.) Wingra's argument concedes that when it sent checks to the Funds, the company was aware of the parties' lack of agreement regarding the terms upon which the interest charges would be waived. (*Id.*)

In summary, the evidence presented indicates that Wingra's payment checks neither incorporated nor were accompanied by any accord and satisfaction language. The evidence also demonstrates that the checks were sent by the company with knowledge that the parties were not in agreement about waiver of the outstanding interest charges. The Court accordingly concludes that Wingra is not entitled to judgment as a matter of law on its claim of an accord and satisfaction as to interest charges from 2006 to 2011. The Funds assert that outstanding interest charges for that period are $964.52 owed to the Pension Fund and $1,209.41 to the Health and Welfare Fund. Since Wingra's only defense to these claims is its accord and satisfaction argument, the Funds' motion for summary judgment is granted as to these amounts. (Def.'s Resp. to Pls.' Stmt. of Material Facts ¶¶ 60, 63, Dkt. No. 61.)

## II.     Pension Fund Contributions

Wingra contends that the CBA terminated on March 31, 2012, and while it concedes that its obligations to contribute to the Funds continued after that date (*see* Def.'s Resp. to Pls.' Stmt. of Material Facts ¶ 40, Dkt. No. 61), it also asserts that it was obligated to contribute to the Pension Fund at the rate in effect on the termination date and was not required to pay the increased rate that took effect the following day. In response, the Funds contend that the CBA did not terminate but rather was extended because the parties continued to operate under its terms.

An employer's obligation to contribute to union benefit funds is not solely dependent upon the continued vitality of a CBA, however. *Central States, S.E. & S.W. Areas Pension Fund v. Gerber Truck Serv., Inc.,* 870 F.2d 1148, 1153 (7th Cir. 1989) (*en banc*). The parties to a CBA may provide for rights that survive termination of the collective bargaining relationship. *Central States, S.E. & S.W. Areas Pension Fund v. Behnke, Inc.,* 883 F.2d 454, 461 (6th Cir. 1989). A participation agreement may also govern benefit fund contribution obligations in the absence of a CBA. *Auto. Mech. Local 701 Welfare and Pension Funds v. Vanguard Car Rental USA, Inc.,* 502 F.3d 740, 748 (7th Cir. 2007). The Funds have standing to seek relief for any breach by Wingra of its agreements with the Union to make fund contributions. *Central States, S.E. & S.W. Areas Pension Fund v. Schilli Corp.,* 420 F.3d 663, 670 (7th Cir. 2005).

In the present case, the CBA extension agreement and the Participation Agreement establish the appropriate pension contribution rate for the period beginning April 1, 2012. The interpretation of those agreements is an issue of law properly resolved on a motion for summary judgment. *Citadel Group Ltd. v. Washington Reg'l Med. Ctr.,* 692 F.3d 580, 587 (7th Cir. 2012). Federal common law rules of contract interpretation apply when agreements are to be construed in the context of claims under the Employee Retirement Income Security Act ("ERISA"). *Central States, S.E. & S.W. Areas Pension Fund v. Kroger Company,* 226 F.3d 903, 911 (7th Cir. 2000).

Although the CBA extension agreement, by its own terms, expired on March 31, 2012, it explicitly defined the pension contribution rate obligation that would take effect after that date. The agreement provided that listed contribution rates "shall be paid" for covered employees, and that for the Pension Fund, the rate was $225.80 per employee per week effective April 1, 2011 and $243.90 per employee per week effective April 1, 2012.

The Participation Agreement between Wingra and the Union further confirms their intent for contribution rate commitments to survive the expiration of a CBA. As noted above, that agreement, which has no termination date, provides: "The parties may execute an interim agreement establishing contribution rates during the periods when a new collective bargaining agreement is being negotiated." (Participation Agt. ¶ 4, Dkt. No. 46-12.) Paragraph 5 of the agreement states that "[the] Agreement and the obligation to pay contributions to the Fund(s) will continue after the termination of a collective bargaining agreement and during a strike except no contributions shall be due during a strike unless the Union and the Employer mutually agree in writing otherwise." (*Id.* ¶ 5.)

Wingra cites a different sentence of the Participation Agreement as support for its argument that it was obligated to contribute to the Pension Fund only at the $225.80 rate after March 31, 2012. That sentence states: "In the absence of an interim agreement, the contribution rate required to be paid after termination of a collective bargaining agreement and prior to either the execution of a new collective bargaining agreement or the termination of this Agreement, shall be the rate in effect on the last day of the terminated collective bargaining agreement."(*Id.* ¶ 4.) But since the CBA extension was itself an agreement establishing post-CBA contribution rates, the provision holding rates at prior levels in the absence of such agreement has no application here.

Wingra argues that it viewed the inclusion of the April 1, 2012 rate increase in the CBA extension agreement as "informational only." (Def.'s Resp. to Pls.' Mot. for Summ. J. at 10 n.8, Dkt. No. 60.) The company offers no evidence that the Union shared this view of that provision, however, and one party's subjective interpretation of a contract is insufficient to contradict unambiguous language. *Pabst Brewing Co., Inc. v. Corrao,* 161 F.3d 434, 442 (7th Cir. 1998);

*City of Oxnard v. U.S.,* 851 F.2d 344, 347 (Fed. Cir. 1988). It is thus apparent that, even if the CBA terminated on March 31, 2012, the parties agreed that Wingra would be obligated to continue making benefit fund contributions thereafter and that its rate for contributing to the Pension Fund would be $243.90 per employee per week beginning on April 1, 2012. The company's argument that the proper rate was the March 31 rate due to the absence of an interim agreement is plainly refuted by the CBA extension.

The Funds' summary judgment motion seeks recovery of shortfalls resulting from Wingra's failure to make pension contributions at the rate effective on April 1, 2013 in addition to the prior year's increase described above. The Funds' motion and supporting materials document such shortfalls extending through June 2013 and also account for payments received through that period. But the Funds' complaint, filed in May 2012, only seeks recovery of amounts revealed by Wingra's reporting of its employees' work history as of April 28, 2012. (Compl. ¶¶ 21-25, Dkt. No. 1.) The complaint does not seek declaratory relief regarding shortfalls expected to accrue after that date, and it has not been amended or supplemented.

A plaintiff must ground its right to relief on events described in the complaint. *Chicago Reg'l Council of Carpenters v. Vill. of Schaumburg,* 644 F.3d 353, 356 (7th Cir. 2011). Damages not raised in the plaintiff's complaint are not properly before the Court and cannot be recovered on a summary judgment motion. *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 105 (2d Cir. 1998) (claims arising after the complaint not recoverable); *Atlas Chem. Indus., Inc. v. Moraine Prods.,* 509 F.2d 1, 7 (6th Cir. 1974) (damages not alleged in the complaint not recoverable). The Funds' motion for summary judgment as to outstanding pension contributions accruing after April 28, 2012 is accordingly denied.

### III. Health and Welfare Fund Contributions

The Funds claim that Wingra improperly reduced its Health and Welfare Fund contribution rate from $281.70 per employee per week to $255.70. The company's initial response to this argument is that the Funds suffered no injury because employees made up the difference between its payments and the amount billed, leaving the Health and Welfare Fund with no shortfall or economic damage, and thus without the injury in fact required for a case or controversy that would confer Article III jurisdiction over this action. But the Funds have presented evidence that only a portion of the health and welfare contribution recovery it seeks was offset by employee contributions, which Wingra does not dispute. (Def.'s Resp. to Pls.' Stmt. of Additional Material Facts ¶ 30, Dkt. No. 66.) The dispute over the unpaid and unreimbursed amounts is a case or controversy sufficient to grant the Funds standing under Article III. *Constr. Indus. Retirement Fund of Rockford v. Kasper Trucking, Inc.,* 10 F.3d 465, 467 (7th Cir. 1993). Accordingly, the Court rejects Wingra's argument that the Funds lack standing to contest the level of its Health and Welfare Fund contributions.

As noted above, the CBA between Wingra and the Union provided that the company was bound by, and a party to, the trust agreement that established the Health and Welfare Fund. The company invokes a provision of the trust agreement as the basis for the reduction of its contributions to that fund. Article III, Section 1 of the trust agreement confirms the company's obligation to make contributions to the fund as required by the CBA, and states that such obligation "shall continue (and cannot be retroactively reduced or eliminated) after termination of the collective bargaining agreement until the date the Fund receives a) a signed contract that eliminates or reduces the duty to contribute to the Fund or b) written notification that the Employer has lawfully implemented a proposal to withdraw from the Fund or reduce its

contributions at the above-specified address." (Health and Welfare Fund Trust Agt. at 9, Dkt. No. 48-5.) Wingra asserts that the May 1, 2012 letter from Shea to Herrmann regarding the company's intention to reduce its health and welfare contributions constituted a notice of a "lawful implementation" that allowed it to reduce its contributions retroactively once the Funds were advised of that action.

In support of its assertion that its reduction was "lawful," Wingra notes that the Union responded to the notice of its contribution reduction by filing a grievance with the National Labor Relations Board ("NLRB"), and that the NLRB's regional director found no violation of the National Labor Relations Act ("NLRA") and dismissed the Union's charge. (Dkt. No. 46-26.) An NLRB decision declining to issue a complaint has no legal effect here, however. *Certco, Inc. v. Int'l Bhd. of Teamsters, Local Union No. 695,* 722 F.3d 1097, 1099-1100 (7th Cir. 2013).

The NLRA does not create rights to ignore contractual obligations. *Teamsters Union Local No. 115 v. De Soto, Inc.,* 725 F.2d 931, 937 (3d Cir. 1984). ERISA requires employers to make contributions to multiemployer benefit plans in accordance with the terms of a collectively-bargained agreement. 29 U.S.C. § 1145. Accordingly, despite the NLRB's conclusion that Wingra's contribution reduction did not violate the NRLA, that reduction cannot be considered "lawful" if it was contrary to an agreement between the company and the Union.

It is readily apparent that Wingra's reduction was contrary to its agreement with the Union. According to the CBA extension, Wingra was entitled to reduce its Health and Welfare Fund contribution to eliminate costs for retirees only upon the signing of a letter of understanding regarding coverage "for designated individuals as agreed to by the parties." (Dkt. No. 46-11.) It is undisputed that no such letter of understanding was ever signed. Wingra blames the Union for this failure—it contends that it had initially agreed with the Union that three

14

retirees would be covered and that the Union subsequently added an additional employee to the proposed letter of understanding. But no written agreement limiting the covered employees to any specific number has been presented in this proceeding and the signed CBA extension contains no such limitation. Since terms of benefits plans must be established by written agreement, *see Central States, S.E. & S.W. Areas Pension Fund v. Auffenberg Ford,* 637 F.3d 718, 720-21 (7th Cir. 2011), Wingra's claims of a Union breach of a prior oral agreement cannot be credited here.

Wingra's reduction of Health and Welfare Fund contributions was thus contrary to its CBA extension agreement with the Union and cannot be considered lawful under the ERISA requirement that employers make contributions in accordance with such agreements. The Court concludes that Wingra was not entitled to reduce its health and welfare contribution rate from $281.70 per employee per week to $255.70. Its motion for summary judgment as to the Funds' claims for contributions to that fund is denied.

As noted above, the Funds' complaint seeks recovery of amounts outstanding as of an audit through April 28, 2012, while its motion for summary judgment requests a judgment for amounts allegedly owed as of June 2013. The Funds' motion is granted as to any delinquencies remaining from the aforementioned audit period and is denied without prejudice as to amounts accruing thereafter.

## CONCLUSION

For the reasons detailed above, Wingra's motion for summary judgment (Dkt. No. 43) is denied. The Funds' motion for summary judgment (Dkt. No. 45) is granted as to the $964.52 owed to the Pension Fund and the $1,209.41 owed to the Health and Welfare Fund in interest charges from period from 2006 through 2011. The Funds' motion is also granted as to other sums owed as reflected by the audit of employee work history through April 28, 2012. Because the parties agree that Wingra's contributions for past periods have continued during the pendency of this action, the current status of such obligations may be detailed by supplemental filings as shall be directed by further order of the Court. Thus, the Funds' motion as to obligations accruing after the aforementioned audit period is denied without prejudice to the Funds seeking to recover such amounts through such a supplemental filing.

ENTERED:

Dated: April 18, 2016

_____
Andrea R. Wood
United States District Judge